**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

ANN L. KOONTZ,

          Plaintiff,

v.                                CIVIL ACTION NO.  2:10-cv-00864

WELLS FARGO N.A.,

          Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending is Plaintiff's motion to re-open this case and motion for an attorneys' fees and costs award [Docket 77.]  For the reasons that follow, the Court **GRANTS** the motion to re-open the case, **DIRECTS** the Clerk to re-open this case, and **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for an attorneys' fees and costs award.

## I.     BACKGROUND

This case, originally filed in state court and later removed to this Court, centered on allegations that Defendant Wells Fargo N.A. engaged in unconscionable conduct concerning the origination and servicing of Plaintiff Ann L. Koontz's home mortgage loan in violation of the West Virginia Consumer Credit Protection Act ("WVCCPA"), West Virginia Code §§ 46A-1-101, *et seq.* (1996) and common law.

On February 28, 2012, the Court dismissed the case after being advised by the parties that they had reached a settlement.  Pursuant to the settlement agreement, Defendant agreed, among

other things, to pay reasonable attorneys' fees and costs in an amount agreed to by the parties or, alternatively, as ordered by the Court. The dismissal Order permitted the parties to move to re-open the case within ninety days upon a showing of good cause.

On May 28, 2012, Plaintiff filed her motion to re-open the case. Plaintiff represents in her motion that the parties have agreed to settle all terms except the amount of attorneys' fees. Defendant does not oppose re-opening the case or an attorneys' fees award; rather, Defendant's only contention is that the amount of attorneys' fees and costs claimed by Plaintiff is unreasonable.

Plaintiff seeks $40,484.60 in costs and attorney fees. This fee request seeks compensation for the work of attorneys Jennifer Wagner, Sara Bird, and Dan Hedges of Mountain State Justice, Inc. Mountain State Justice is a local non-profit public interest law firm that represents low-income individuals in several practice areas, including predatory mortgage lending schemes. Plaintiff moves for an award for fees and costs based upon hourly rates of $275 per hour for Ms. Wagner and Ms. Bird, and $425 per hour for Mr. Hedges. Additionally, Plaintiff requests a $100 hourly rate for paralegal work and $3,349 in expenses.

In support of her motion, Plaintiff tenders affidavits of each of the Mountain State Justice attorneys and their computerized time sheets, their paralegals' time sheets, and a list of case-related costs and expenses. The affidavits from Ms. Wagner, Dan Hedges, and Ms. Bird detail their professional qualifications and years in practice. Counsel represent that their requested hourly rate is within the prevailing market rate for local attorneys with similar academic and professional backgrounds according to information provided by unnamed area attorneys. Finally, Plaintiff also offers a West Virginia state court order awarding fees to various members of Mountain State Justice staff, including Mr. Hedges.

2

Defendant agrees that the Court should award fees and costs, but contends that the fees and costs should be substantially less than the requested $40,484.69.  Defendant contends that $40,484.69 is unreasonable because: (1) the hourly attorney rates are unreasonable and unsupported by independent evidence of area market rates; (2) the billing records offer little detail of the work actually provided; (3) the paralegal fees are inflated because they include billing for non-legal, administrative tasks; (4) no evidence is offered to substantiate the claim of $3,349 in costs; and (5) Plaintiff is not entitled to recover the costs related to the preparation of her attorneys' fees motion because she was not the prevailing party in the litigation and because the parties' settlement contemplated a reasonable attorneys' fee award for the work up to the point of settlement.

In her Reply, Plaintiff offers affidavits from four highly experienced local attorneys. These attorneys each attest that the requested attorney rates are reasonable for attorneys with the same "experience and background in this community."[1]  Plaintiff also tenders additional state court attorneys' fee orders, affidavits from other Mountain State Justice legal professionals, and additional documents supporting Ms. Koontz's costs request.

---

[1]     Plaintiff did not provide these attorneys' affidavits with her original motion.  In its response to Plaintiff's motion, Defendant correctly faults Plaintiff for this shortcoming and argues that Plaintiff has failed to carry her burden because she is required to offer specific evidence of prevailing market rates in the local community. Defendant anticipates in his response that Ms. Koontz would file a reply that attached additional evidence to bolster her motion.  As it turns out, Ms. Koontz did just that.

Wells Fargo is also correct that Ms. Koontz carries the burden of proving the reasonableness of the requested fees and costs.  Also, it appears that all of the attachments to Plaintiff's Reply tend to assist Ms. Koontz in carrying her initial burden of proof—rather than being offered solely for rebuttal of an unanticipated argument in Wells Fargo's response.  The Court agrees that the better practice would have been for Ms. Koontz to provide all of the attachments with her motion, rather than in a reply.  The Court, however, in this case will consider all of the materials tendered.  The Court cautions Plaintiff's counsel, however, to not repeat this error.

*II. APPLICABLE LAW*

A.    *West Virginia Law Governs the Attorneys' Fees Reasonableness Analysis under the WVCCPA, Although Federal Precedent Should Be Consulted to the Extent It Does Not Conflict with West Virginia's Jurisprudence.*

The parties appear to assume that the determination of the reasonableness of attorneys' fees is governed by federal law and cite *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243-46 (4th Cir. 2009) (calculating a lodestar attorneys' fee using a twelve-factor methodology derived from *Johnson v. Ga. Highway Express, Inc*., 488 F.2d 714 (5th Cir.1974)).   This assumption merits discussion.

The parties' assumption is understandable because the Court's research has revealed that some district courts sitting in diversity have solely consulted federal precedent when conducting their reasonableness of attorneys' fees inquiry and have offered no discussion of whether the matter is one of state or federal law.  The Fourth Circuit has not squarely addressed this issue of in a published opinion.  In reviewing the reasonableness of an attorneys' fees award permitted under state statutes, however, the Fourth Circuit has looked to state law.  *See Peter Farrell Supercars, Inc. v. Monsen*, 82 Fed. App'x 293 (4th Cir. 2003) (applying Virginia law); *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 631-32 (4th Cir. 1999) (same).  Also, the Supreme Court has stated in dicta that, with the exception of fees imposed as a sanction for misconduct by a litigant or counsel, a federal court sitting in diversity and adjudicating state claims applies state law in determining whether to allow attorneys' fees so long as the state law does not run counter to a valid federal statute or court rule.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 51-52 (1991); *Alyeska Pipeline Serv. Co. v. Wilderness Soc.*, 421 U.S. 240, 259 n.31 (1975) (" '[I]n an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's

fees or giving a right thereto, which reflects a substantial policy of the state, should be followed.'" (quoting 6 J. Moore, *Federal Practice* 54.77(2), pp. 1712-1713 (2d ed. 1974))).  And recently, a district court, following a thorough and thoughtful analysis of the subject, held that "where state law supplies the rule of decision in a case, state law governs both whether to award fees and the determination whether the requested fee is reasonable." *E.I. DuPont de Nemours and Co. v. Kolon Indus. Inc.*, No. 3:09cv058, 2012 WL 6540072 at *16 (E.D. Va. Dec. 13, 2012) (Payne, J.).

Based on the foregoing authorities, the Court agrees that West Virginia law governs the question of whether attorneys' fees should be awarded and, if so, what a reasonable fee is. Where, however, federal law requires consideration of similar reasonableness factors, federal precedent may nonetheless be consulted to the extent it does not conflict with West Virginia's jurisprudence interpreting the reasonableness of attorneys' fees.  *See id.* at *17 (citations omitted).  Although, as discussed below, there is great similarity in the application of the reasonableness factors in federal and West Virginia cases, some tension exists.

> B.     *Federal and West Virginia Law Governing the Reasonableness Analysis of Attorneys' Fees.*

>> 1.     *Federal Law*

In the American legal system, attorneys' fees are ordinarily not a recoverable cost of litigation unless expressly authorized by statute, are contractually agreed to by the parties, or the case involves bad faith or misconduct by a party or counsel.  Our country's founders, ever wary of aristocratic rules of law, favored this so-called "American Rule" because they believed the English practice of imposing attorneys' fees on the losing party was a rule that favored wealthy litigants and deterred poor, powerless persons from seeking legal redress in the courts.  The

American Rule is followed in the federal system and in many states, including West Virginia. *See* 28 U.S.C. § 2412(a)(1); *Key Tronic Corp. v. United States*, 511 U.S. 809, 814-15 (1994); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. at 247; Syl. Pt. 2, *Sally-Mike Properties v. Yokum*, 365 S.E.2d 246 (W. Va. 1986).

In 1975, in *Alyeska Pipeline Serv. Co.*, *supra*, the Supreme Court stated that judicial fashioning of attorneys' fees awards without congressional authority violated the American Rule. 421 U.S. at 262-64.  In *Alyeska*, two environmental groups sought to block construction of the trans-Alaska oil pipeline. *Id.* at 242-43.  The groups filed suit in federal court seeking injunctive and declaratory relief invoking the court's original jurisdiction. *Id*.  After several years of tortuous litigation that included the plaintiffs' loss in district court and a win in the court of appeals, Congress, in the end, passed legislation that gutted the merits of the plaintiffs' arguments.  *Id.* at 244-45.  The United States Court of Appeals for the District of Columbia Circuit, however, awarded attorneys' fees and costs to the plaintiffs even though no federal statute authorized such an award.  *Id.* at 245-46.  The court reasoned that the plaintiffs had acted as a sort of "private-attorney-general" to vindicate important rights of all citizens and that, without an award, private parties would be deterred by the great cost that accompanies the enforcement of environmental laws, particularly against well-financed defendants.  *Id.*  The Supreme Court reversed, declining to "fashion a far-reaching exception" to the American Rule restricting attorneys' fees.  *Id.* at 247.  Following an examination of the history of the American Rule and the explicit statutory restrictions that Congress had set on costs and fees in 28 U.S.C. §§ 1920 & 1923, the Court found that Congress had not "extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted" and that "the circumstances under which attorneys' fees are to be awarded and the

range of discretion of the courts in making those awards are matters for Congress to determine." *Id.* at 260-62.   The Supreme Court acknowledged that in limited instances (such as cases involving a trustee of a fund, or when a party acts in bad faith, or willfully disobeys a court order), courts do have inherent and equitable power to award attorneys' fees in excess of the amounts permitted in 28 U.S.C. § 1920.   The Court, however, soundly rejected the court of appeals' "private-attorney-general" rationale as a valid exception to the American Rule.   *Id.* at 257-59.

Over the years, especially post-*Alyeska*, Congress has enacted legislation allowing "reasonable" attorneys' fees awards to the prevailing party under certain statutes.   *See, e.g.*, 5 U.S.C. § 552(a)(4)(E)(1) (Freedom of Information Act) ("The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed."); 15 U.S.C. § 15 (Clayton Act) ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."); 15 U.S.C. § 1640(a)(3) (Truth in Lending Act) (imposing liability for "the costs of the action, together with a reasonable attorney's fee as determined by the court"); 17 U.S.C. § 1323(d) (Copyright Act) ("[T]he court may award reasonable attorney's fees to the prevailing party."); 28 U.S.C. § 2412 (Equal Access to Justice Act) ("Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action."); 29 U.S.C. § 216(b) (Fair Labor Standards Act) ("The court in such

7

action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."); 42 U.S.C. § 1988(b) (various federal civil rights acts) ("[T]he court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ."); 42 U.S.C. § 3612(p) (Fair Housing Act) (a court "in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs."); 42 U.S.C. § 12101-12213 (American with Disabilities Act) ("In any action or administrative proceeding commenced pursuant to this chapter, the court or agency, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses, and costs, and the United States shall be liable for the foregoing the same as a private individual.").

So, too, West Virginia, like many other states, has its own cadre of "fee-shifting" statutes. *See, e.g.*, W. Va. Code § 5-11-13 (West Virginia Human Rights Act) ("In actions brought under this section, the court in its discretion may award all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, to the complainant."); W. Va. Code § 21-5-12 (Wage Payment and Collection Act) ("The court in any action brought under this article may, in the event that any judgment is awarded to the plaintiff or plaintiffs, assess costs of the action, including reasonable attorney fees against the defendant."); W. Va. Code § 29B-1-7 (West Virginia Freedom of Information Act) ("Any person who is denied access to public records requested pursuant to this article and who successfully brings a suit filed pursuant to section five of this article shall be entitled to recover his or her attorney fees and court costs from the public body that denied him or her access to the records."); W. Va. Code § 36B-3-116(f) (Uniform Common Interest Ownership Act) ("A judgment or decree in any action brought under this section must include costs and reasonable attorney's fees for the prevailing party."); W. Va.

Code § 46A-5-104 (West Virginia Consumer Credit and Protection Act) ("In any claim brought under this chapter applying to illegal, fraudulent or unconscionable conduct or any prohibited debt collection practice, the court may award all or a portion of the costs of litigation, including reasonable attorney fees, court costs and fees, to the consumer.  On a finding by the court that a claim brought under this chapter applying to illegal, fraudulent or unconscionable conduct or any prohibited debt collection practice was brought in bad faith and for the purposes of harassment, the court may award to the defendant reasonable attorney fees.").

Most statutes where attorneys' fees are authorized share something in common.  They, just like the court of appeals in *Alyeska,* attempt to furnish legal remedies that vindicate the economic or social rights of individuals who might not otherwise be able to afford the costs of litigation.  For example, the legislative history of The Civil Rights Attorney's Fees Awards Act of 1976—which was an explicit response by Congress to *Alyeska*—shows that Congress understood that the federal civil rights laws

> depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.
>
> In many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer. If private citizens are to be able to assert their civil rights, and if those who violate the Nations's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court.

S. Rep. 94-1011, at 2 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5908.   It is clear from this legislative history that the determination of what is a reasonable attorneys' fee (at least in in civil rights cases) should be "governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases and not be reduced because the rights involved

may be nonpecuniary in nature." *Id.* at 6.   The fees should be "adequate to attract competent counsel" but not so much as to "produce windfalls to attorneys." *Id.*   "In computing the fee, counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, 'for all time reasonably expended on a matter.' " *Id.*

To aid the courts in this task, Congress gave an approving nod to four cases where the courts applied appropriate standards.   One of these cases was *Johnson v. Ga. Highway Express*, 488 F.2d 714 (5th Cir. 1974).   In *Johnson*, an employment discrimination class action, the Fifth Circuit vacated the district court's attorneys' fees award because it failed to "elucidate the factors which contributed to the decision and upon which it was based." *Id.* at 717.   The court remanded the case with instructions to reconsider the fees award in light of twelve specific factors.   These factors were:  (1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case (which involves the dual considerations of whether otherwise available business is foreclosed because of conflicts of interest which occur from the representation, and whether the attorney is not free to use the time spent on the client's behalf for other purposes once the employment is undertaken);  (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) In no event, however, should the litigant be awarded a fee greater than he is contractually bound to pay, if indeed the attorneys have contracted as to amount; (7) Time limitations imposed by the client or the circumstances;  (8) The amount involved and the results obtained;  (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case;  (11) The nature and length of the professional relationship with the client;  (12) Awards in similar cases. *Id.* at 717-19.

The United States Supreme Court has since criticized *Johnson*'s factors test.   In *Pennsylvania v. Delaware Valley Citizen's Council for Clean Air*, 478 U.S. 546, 562 (1986) (*Delaware I*), the Supreme Court examined several questions relating to the fee-shifting statute under the Clean Water Act, 42 U.S.C. § 7401, *et seq.*   The district court's enhancements to the lodestar figure were based on the plaintiff's risk of not prevailing and counsel's superior performance.   In addressing this determination, the Court conducted a thorough review of the jurisprudence governing the determination of reasonable attorneys' fees awards.   The Court first noted that district courts "have struggled to formulate the proper measure for determining the 'reasonableness' of a particular fee award."  *Id.* at 563.   Observing that *Johnson* "was widely followed" by district courts and was cited with approval by Congress, the Court stated that *Johnson*'s "mode of analysis" in reality "gave very little actual guidance to district courts."  *Id.* at 563.   The Court stated, "[s]etting attorney's fees by reference to a series of sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results."  *Id.*

The Court then noted an alternative "reasonable attorneys' fees" test, the so-called "lodestar test."   The "lodestar test", first developed in the Third Circuit, involved two steps. First, a district court multiplied the hours an attorney spent on a case by a reasonable hourly rate of compensation for each attorney involved to arrive at a "lodestar" figure.  *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp*., 487 F.2d 161, 167 (3d. Cir. 1973) (*Lindy* I).   Second, the district court could then make adjustments to the lodestar amount in light of:  (1) the contingent nature of the case, reflecting the likelihood that hours were invested and expenses incurred without assurance of compensation; and (2) the quality of the work performed as evidenced by the work observed, the complexity of the issues and the recovery obtained.  *Merola v. Atlantic Richfield Co*., 515 F.2d 165, 168 (3d Cir. 1975); *Lindy*

*Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 117 (3d. Cir. 1976) (*Lindy II* ).

As with the *Johnson* factors, the Supreme Court also found flaws with the lodestar approach. Although the Court found the lodestar approach "provided a more analytical framework for lower courts to follow than the unguided 'factors' approach provided by *Johnson*," the lodestar analysis "allow[ed] the courts to adjust the lodestar amount based on considerations of the 'riskiness' of the lawsuit and the quality of the attorney's work" and this produced "inconsistent and arbitrary fee awards." *Delaware Valley I*, 478 U.S. at 564.

In *Delaware Valley I*, the Court explained that it reconciled the deficiencies in *Johnson*'s factors test and the lodestar test in *Hensley v. Eckerhart*, 461 U.S. 424 (1983). *Hensley* "adopted a hybrid approach that shared elements of both *Johnson* and the lodestar method of calculation." 478 U.S. at 564. Under *Hensley*, the Court held that the "most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. *Id.* However, under *Hensley* a district court could "adjust the fee upward or downward" based on other considerations including the *Johnson* factors. *Id.* at 434. The Court noted, however, that "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Id.* at 434, n.9.

Continuing its review of its precedent, the Supreme Court in *Delaware I* then observed that it had "further refined our views" in *Blum v. Stenson*, 465 U.S. 886 (1984). In *Blum*, another federal civil rights case, the Court considered, among other things, whether "Congress intended fee awards to nonprofit legal service organizations to be calculated according to cost or to

prevailing market rates." 465 U.S. at 888.   The petitioner in *Blum* argued for a cost-based standard contending, among other things, that permitting private market rates would provide excessive fees to non-profit counsel.  *Id.* at 892-93.  The Court held that reasonable fees under 28 U.S.C. § 1988 were to be calculated based on "the prevailing market rates in the relevant community, regardless of whether [the] plaintiff is represented by private or nonprofit counsel." *Id.* at 895.   As for petitioner's policy arguments, those complaints "should be addressed to Congress rather than to this Court."   *Id.* at 895-96.   The Court further stated that the figure resulting from *Hensley's* first step (*i.e.* multiplying the number of hours reasonably expended by a reasonably hourly rate) is presumed to be the reasonable fee.  *Id.* at 897.   Further, the Court stated that the "novelty [and] complexity of the issues," "the special skill and experience of counsel," the "quality of representation," and the "results obtained" from the litigation are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award.  *Id.* at 898-900.  *Blum* made clear that upward adjustments of the lodestar figure are permissible, but such modifications are proper only in certain "rare" and "exceptional" cases, supported by both "specific evidence" on the record and detailed findings by the lower courts. *See Id.* at 898-901.

Following its review of *Hensley* and *Blum*, the Court in *Delaware I* concluded:

A strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a "reasonable" fee is wholly consistent with the rationale behind the usual fee-shifting statute, including the one in the present case.  These statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client.  Instead, the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws. Hence, if plaintiffs, such as Delaware Valley, find it possible to engage a lawyer based on the statutory assurance that he will be paid a "reasonable fee," the purpose behind the fee-shifting statute has been satisfied.

13

Moreover, when an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests. Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly rate, thus adequately compensates the attorney, and leaves very little room for enhancing the award based on his post-engagement performance. In short, the lodestar figure includes most, if not all, of the relevant factors constituting a "reasonable" attorney's fee, and it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance.

Although *Delaware Valley I* established that enhancements to the lodestar figure will be rarely justified, the Court left open the question of whether a prevailing plaintiff's attorney should or may be awarded separate compensation for assuming the risk of not being paid. The Court took up that question a year later in *Pennsylvania v. Delaware Valley Citizen's Council for Clean Air (Delaware II)*, 483 U.S. 711 (1987) and reversed the court of appeals' affirmance of the district court's enhancement of the fee award based on the risk of not being paid. Justice White, writing for a plurality, stated "we are unconvinced that Congress intended the risk of losing a lawsuit to be an independent basis for increasing the amount of any otherwise reasonable fee for the time and effort expended in prevailing." *Id.* at 725.

Following *Delaware Valley I & II*, the Supreme Court, in *City of Burlington v. Dague*, 505 U.S. 557, 559 (1992), re-visited the reasonable fee determination, this time in a case where the district court enhanced the lodestar fee amount by twenty-five percent based on the fact that their attorneys were retained on a contingency-fee basis. *Id.* at 559-60. The district court justified the enhancement based on its finding that the plaintiffs' risk of not prevailing was substantial, and because the plaintiffs would have faced substantial difficulty obtaining counsel of reasonable skill and competence if the opportunity for a lodestar enhancement was not

available. *Id.* at 560. The Second Circuit Court of Appeals affirmed. *Id.* The Supreme Court reversed, explicitly adopting Justice White's opinion in *Delaware II* and held that "enhancement for contingency is not permitted" under 33 U.S.C. § 1365(d) (Clean Water Act) and 42 U.S.C. § 6972(e) (Solid Waste Disposal Act), the fee-shifting statutes at issue in the case.

The Supreme Court's most recent examination of fee-shifting statutes came in *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, ___, 130 S.Ct. 1662, 1669 (2010). In *Perdue*, a class action civil rights lawsuit, the district court enhanced the lodestar attorneys' fees figure by seventy-five percent. *Id.* at 1670. The Court reversed, finding the district court's decision was arbitrary and did not apply the governing standards. *Id.* at 1675-76. The Court reaffirmed the rule that the calculation of an attorney's fee, under federal fee-shifting statutes, based on a lodestar figure may be increased in extraordinary cases due to superior performance and results. The Court re-emphasized, however, that

> [T]here is a strong presumption that the lodestar is sufficient; factors subsumed in the lodestar calculation cannot be used as a ground for increasing an award above the lodestar; and a party seeking fees has the burden of identifying a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified.

*Id.* The Court stated:

> Our prior decisions concerning the federal fee-shifting statutes have established six important rules that lead to our decision in this case.

> First, a "reasonable" fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case.

> Second, the lodestar method yields a fee that is presumptively sufficient to achieve this objective. Indeed, we have said that the presumption is a "strong" one.

> Third, although we have never sustained an enhancement of a lodestar amount for performance, we have repeatedly said that enhancements may be awarded in "'rare'" and "'exceptional'" circumstances.

15

Fourth, we have noted that "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee," and have held that an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation.   We have thus held that the novelty and complexity of a case generally may not be used as a ground for an enhancement because these factors "presumably [are] fully reflected in the number of billable hours recorded by counsel." We have also held that the quality of an attorney's performance generally should not be used to adjust the lodestar "[b]ecause considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate."

Fifth, the burden of proving that an enhancement is necessary must be borne by the fee applicant . . .

Finally, a fee applicant seeking an enhancement must produce "specific evidence" that supports the award.   (An enhancement must be based on "evidence that enhancement was necessary to provide fair and reasonable compensation"). This requirement is essential if the lodestar method is to realize one of its chief virtues, *i.e.,* providing a calculation that is objective and capable of being reviewed on appeal.

*Id.* (citations omitted).

Fourth Circuit law in this area is well-developed.   In calculating an award of attorneys' fees in fee-shifting cases, courts must first determine a "lodestar figure" by multiplying the number of reasonable hours expended times a reasonable rate. *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009) (citing *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008)). "The lodestar method produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue v. Kenny, supra*, 559 U.S. at  ___, 130 S.Ct. at  1672.

"After determining the lodestar figure, the court then should subtract fees for hours spent on unsuccessful claims unrelated to successful ones. . . . [O]nce the court has subtracted the fees incurred for unsuccessful, unrelated claims, it then awards some percentage of the remaining

amount, depending on the degree of success enjoyed by the plaintiff." *Robinson*, 560 F.3d at 244 (internal quotations and citations omitted); *see also Hensley*, 461 U.S. at 434 ("The product of reasonable hours times a reasonable rate does not end the [attorneys' fees] inquiry.  There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of 'results obtained.' ").

This Court has stated that "[w]hen calculating reasonable fees, establishing the hourly rate is generally the critical inquiry." *Wolfe v. Green*, No. 2:08-cv-01023, 2010 WL 3809857 *4, (S.D. W. Va. Sept. 24, 2010) (Copenhaver, J.) (quoting *Westmoreland Coal Co. v. Cox*, 602 F.3d 276, 289 (4th Cir. 2010)).  "In determining the market rate, the court should consider evidence of what attorneys earn for performing similar services in similar circumstances, 'which, of course, may include evidence of what the plaintiff's attorney actually charged his client.' " *Id*. (quoting *Depaoli v. Vacation Sales Assocs., L.L.C.*, 489 F.3d 615, 622 (4th Cir. 2007)).  "[T]he community in which the court sits is the first place to look to in evaluating the prevailing market rate." *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 179 (4th Cir. 1994).  "In circumstances where it is reasonable to retain attorneys from other communities, however, the rates in those communities may also be considered." *Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 317 (4th Cir. 1988).  "[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Grissom*, 549 F.3d at 321 (" '[T]he burden rests with the fee applicant to establish the reasonableness of a requested rate.  In addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award.' " (quoting

17

*Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990)).  "Specific evidence" of the prevailing market rates are "affidavits of other local lawyers who are familiar both with the skills of the fee applicants and more generally with the type of work in the relevant community."  *Westmoreland*, 602 F.3d at 290 (quoting *Robinson*, 560 F.3d at 245).  Additionally, "[t]he fee request should, at a minimum, (1) provide dates work was performed, (2) a reasonable, specific description of the work, and (3) time expended on the work." *Central Cab Company, Inc., v. Cline*, 972 F. Supp. 370, 374 (S.D. W. Va. 1997) (Haden, C.J.)

Importantly, the determination of fees "should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. at 436–37.  As the Supreme Court recently emphasized:

> The fee applicant (whether a plaintiff or a defendant) must, of course, submit appropriate documentation to meet "the burden of establishing entitlement to an award."  But trial courts need not, and indeed should not, become green-eyeshade accountants.  The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection.  So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.  And appellate courts must give substantial deference to these determinations, in light of "the district court's superior understanding of the litigation."  We can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it.

*Fox v. Vice*, ___ U.S. ___, 131 S.Ct. 2205, 2216 (2011) (holding that a court may grant reasonable attorneys' fees to a defendant in a civil rights case where the plaintiff alleged both frivolous and non-frivolous claims, but the fee award may only be for costs that the defendant would not have incurred but for the frivolous claims) (internal citations omitted)).

> 2.    *West Virginia Law*

As with federal law, many of the West Virginia cases addressing reasonable attorneys' fees analysis are in the context of civil rights.  *See Heldreth v. Rahimian*, 637 S.E.2d 359 (W. Va. 2006); *Shafer v. Kings Tire*, 597 S.E.2d 217 (W. Va. 1998); *Brown v. Thompson*, 452 S.E. 2d

728 (W. Va. 1995); *Casteel v. Consol. Coal*, 383 S.E.2d 305 (W. Va. 1989); *Bishop Coal Co. v. Salyers*, 380 S.E.2d 238 (W. Va. 1989).  In suits brought under the West Virginia Human Rights Act, West Virginia Code §§ 5-11-1, *et seq.*, the West Virginia Supreme Court of Appeals has held:

> When the relief sought in a human rights action is primarily equitable, "reasonable attorneys' fees" should be determined by (1) multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate-the lodestar calculation-and (2) allowing, if appropriate, a contingency enhancement. The general factors outlined in Syllabus Point 4 [of] *Aetna Cas. & Sur. Co. v. Pitrolo*, 176 W.Va. 190, 342 S.E.2d 156 (1986) should be considered to determine: (1) the reasonableness of both time expended and hourly rate charged; and, (2) the allowance and amount of a contingency enhancement.

Syl. Pt. 3, *Bishop Coal Co*, 380 S.E.2d at 239, 247-48.

The West Virginia Supreme Court of Appeals has recently decided two cases that address reasonable attorneys' fees in the context of the WVCCPA: *Vanderbilt v. Cole*, Nos. 11-1288, 11-1604, 2013 WL 870442, slip op. (W. Va. March 8, 2013) and *Quicken Loans, Inc. v. Brown*, No. 11-0910, 2012 WL 5897495, slip op. (W. Va. Nov. 21, 2012).  Both *Vanderbilt* and *Quicken Loans* involve, as here, claims of illegal conduct concerning home mortgage loans.

In *Vanderbilt* , the West Virginia Supreme Court stated:

> The Court has enunciated the purpose of the WVCCPA: "The purpose of the [WVCCPA] is to protect consumers from unfair, illegal, and deceptive acts or practices by providing an avenue of relief for consumers who would otherwise have difficulty proving their case under a more traditional cause of action." Furthermore, we have said that the WVCCPA "represents a comprehensive attempt on the part of the Legislature to extend protection to the consumers and persons who obtain credit in this State." Finally, we have explained that the WVCCPA should be construed liberally in favor of the consumer.

*Id.* slip op. at *10-11 (citations omitted).  The court emphasized that an award of attorneys' fees under West Virginia Code § 46A-5-104 is "purely discretionary." *Id.*  (citations omitted).  The court held that the WVCCPA does not require a party to prevail on the majority of his claims in

order to receive attorneys' fees.  *Id.* slip op. at *23.  The court also approved of the trial court's

consideration under *Aetna's* "undesirability" factor that plaintiff's law firm, Mountain State

Justice, is a "unique organization" that "survives based upon fees collected in 'undesirable' cases

such as [plaintiff's]."  *Id.*  In reviewing the reasonableness of an attorneys' fees award the court

also approved of the trial court's application of the twelve factor test described in *Aetna Cas. &*

*Sur. Co. v. Pitrolo*, 342 S.E.2d 156 (W. Va. 1986).   The *Aetna* factors are patterned on those set

forth in the Fifth Circuit's decision, *Johnson v. Ga. Highway Express*, *supra*.  The *Aetna* factors

are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3)
> the skill requisite to perform the legal service properly; (4) the preclusion of other
> employment by the attorney due to the acceptance of the case; (5) the customary
> fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the
> client or circumstances; (8) the amount involved and the results obtained; (9) the
> experience, reputations, and ability of the attorneys; (10) the undesirability of the
> case; (11) the nature and length of the professional relationship with the client;
> and (12) awards in similar cases.

*Id.*  (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).

The West Virginia Supreme Court has also cited Rule 1.5.(a) of the West Virginia Rules

of Professional Conduct, which sets forth similar factors, as guidance in determining the

reasonableness of attorneys' fees.  *Fauble v. Nationwide Mut. Fire Ins. Co.*, 664 S.E.2d 706, 714

(W. Va. 2008).

Under West Virginia law, a "contingency enhancement" (sometimes referred to as a

multiplier), may be "used to enhance the 'normal' hourly fee to compensate for the risk of loss."

*Comm. on Legal Ethics v. Triplett*, 378 S.E.2d 82, 93 (W. Va. 1988).   The West Virginia

Supreme Court has recognized, however, that "[t]he great weight of authority is that the lodestar

calculation is the general rule in awarding attorneys' fees with occasional contingency

enhancement." *Bishop Coal*, 380 S.E.2d at 249 n.10; *see also Heldreth*, 637 S.E.2d at 366 n.11 (noting that in federal courts the use of a fee enhancement mechanism in conjunction with fee-shifting statutes has been expressly rejected citing *City of Burlington v. Dague*, 505 U.S. 557, 565-66 (1992)).

### III. DISCUSSION

As part of their settlement agreement, Defendant agreed to pay Plaintiff's reasonable attorneys' fees and costs as agreed to by the parties or, in the event they could not agree, the parties agreed the issue would be determined by the Court.  Among the various claims Plaintiff asserted in her Complaint is a count alleging a violation of the WVCCPA.   West Virginia Code § 46A-5-104 provides: "In any claim brought under this chapter applying to illegal, fraudulent or unconscionable conduct or any prohibited debt collection practice, the court may award all or a portion of the costs of litigation, including reasonable attorney fees, court costs and fees, to the consumer. . . ."

Plaintiff requests a fees and costs award of $40,484.60 based on the following:

| Attorney Jennifer S. Wagner | 109.40 hours/$275 per hour | $ 30,085.00 |
|---|---|---|
| Attorney Daniel F. Hedges | 12.00 hours/$425 per hour | $  5,100.00 |
| Attorney Sara Bird | 1.20 hours/$275 per hour | $    330.00 |
| Paralegal Tonya Fields | 9.20 hours/$100 per hour | $    920.00 |
| Paralegal Miranda Johnson | 7.00 hours/$100 per hour | $    700.00 |
| Costs and Expenses | | $  3,349.60 |
| **Total** | | **$40, 484.60** |

21

Defendant challenges the reasonableness of Plaintiff's proposed hourly attorney rates principally contending that: (1) Plaintiff failed to submit sufficient evidence of the prevailing market rates for similar work by comparable attorneys in this community; (2) this Court has previously awarded lower rates for these attorneys in other recent cases; and (3) that Plaintiff's costs should not extend to work on the present motion for costs.   Defendant does not, however, challenge the reasonableness of the paralegal rates.   Defendant does challenge the sufficiency of the evidence to support a costs award.   Finally, Defendant argues that because Plaintiff sought actual and punitive damages and penalties, but settled the case without any "monetary payment," Plaintiff's success in this case was marginal, a factor under the *Johnson* analysis that merits further reduction in the requested fees award.

A.   *Reasonable Hourly Rates*

Based on the foregoing survey of federal and state case law, the Court will determine the lodestar figure by multiplying the number of hours reasonably expended on litigation by a reasonable hourly rate.   The Court will be guided in by the *Aetna/Johnson* factors in determining the reasonableness of the time expended and the hourly rate charged.   Four of these factors are "particularly relevant" to the Court's determination of reasonable hourly rates: (1) the customary fee for like work; (2) the experience, reputation, and ability of the attorneys; (3) attorneys' fees awards in similar cases; and (4) the amount in controversy and the results obtained.   *Wolfe*, 2010 WL 3809857 *5 (applying the *Johnson* factors).   The Court will consider each of these factors in turn.

1.   *Customary Fees for Similar Work in the Community*

The only evidence Plaintiff initially tendered in support of this factor were affidavits from Plaintiff's counsel.   Each of these affidavits contains nearly identical assertions.   Ms.

Wagner's affidavit states: "In communications with other attorneys in the area, I am informed that the market rate in this community for an attorney with my level of experience and academic background is $225 to $300 per hour.  My current hourly rate is $275.00/hour."  (Docket 77-2.)  Ms. Bird's affidavit contains an identical provision, but no market rate range is provided.  Nor is there a statement of what her hourly rate is.  Rather, Ms. Bird states that she was informed that the market rate for her work is "$275.00."  (Docket 78.)  Mr. Hedges' affidavit states:  "In communications with other attorneys around the country in this specialized area, I am informed that the market rate in this community for an attorney with my years of experience and with very specialized experience is $350 to $600 per hour.  My current rate is $425/hour."  (Docket 77-3.)  None of these affidavits identifies the names of the attorneys with whom the affiants spoke.  None of these affidavits explicitly states that these rates are in fact billed and received by local attorneys in connection with the type of work at issue here, consumer credit law.  None of these affidavits identifies the second-hand sources of information.

Only after Defendant filed its response and challenged the adequacy of Plaintiff's prevailing market rate evidence did Plaintiff offer affidavits from peer attorneys.  These peer affidavits are from four highly experienced local attorneys associated with West Virginia private practice law firms: John Poffenbarger, Benjamin Bailey, Anthony Majestro, and David Grubb.  It appears that of these attorneys, only one, Mr. Grubb, actually specializes in consumer law.  With the exception of Mr. Grubb's affidavit, these affidavits are brief (one and a half pages at the most).  None of these lawyers provides any evidence of their own (or any member of their firm's) past or present hourly billing rates for consumer law cases.  All four of these affidavits contain an identical recitation regarding the reasonableness of Plaintiff's counsel's rates:  "I believe these rates are reasonable, and within the range of hourly rates charged for attorneys of

their experience and background in this community." (Docket 80-3, 80-4, 80-5, 80-6.) Each of these attorneys states that he is "very familiar with the work of Mountain State Justice, Inc." However, Mr. Poffenbarger's and Mr. Majestro's affidavits contain no representation that either attorney personally knows—or even knows of—the reputations, skills, and training of Ms. Wagner, Ms. Bird, or Mr. Hedges. On the other hand, Mr. Bailey states that he has a long-standing professional relationship with Mr. Hedges and has litigated cases with and against him. Mr. Bailey is silent, however, regarding Ms. Wagner's, Ms. Bird's, and Mr. Hedges's reputations. Mr. Grubb is more informative. He states that he is familiar with the work of all three of Plaintiff's counsel. Although Mr. Grubb offers no information regarding Ms. Wagner and Ms. Bird, he states that Mr. Hedges "has an excellent reputation and is recognized by his peers, including me, as one of the premiere consumer trial attorneys in not just West Virginia, but the entire country." (Docket 80-6.) Only Mr. Grubb's affidavit provides specific evidence of previous fee awards he has received. Mr. Grubb, an attorney with more than thirty years' experience and who specializes in "consumer law," states he was awarded in connection with West Virginia state court litigation hourly rates $300 in 2005, $325 in 2006, and $350 in 2008. Mr. Grubb also provides five examples of fees awarded to other West Virginia lawyers. Only one of these five cases, however, is a consumer law case. Also, these case examples do not offer any information as to the qualifications or experience of counsel in those cases. The Court, however, is familiar with most of these lawyers. They are contemporaries of Mr. Hedges, and, thus, have decades more experience than Ms. Wagner or Ms. Bird. Additionally, with respect to any of the eight cases cited by Mr. Grubb, there is no way for the Court to discern whether the opposing parties, as here, contested the hourly rates or what lodestar factors influenced the rate determinations.

The peer affidavits are deficient in other respects.  Although Mr. Poffenbarger's and Mr. Majestro's affidavits state that they are "very familiar with the work of Mountain State Justice, Inc.," neither contains any evidence that these attorneys are "familiar with the skills of the fee applicants." *See Westmoreland,* 602 F.3d at 290.  Mr. Bailey's affidavit states that he has "known of Mr. Hedges' work" since the 1980s, but, unlike Mr. Grubb's explicit and glowing commendation of Mr. Hedges' work, Mr. Bailey's affidavit fails to characterize Mr. Hedges' work one way or another.  Because Mr. Bailey ultimately concludes that Plaintiff's counsel's rates are reasonable, the Court will infer that Mr. Bailey has a positive opinion of Mr. Hedges' legal skills.  Mr. Grubb's affidavit is also problematic.  While Mr. Grubb's affidavit states that he is "very familiar" with the work of all three of the lawyers in this case, his statements attesting to the good reputation and skills of Plaintiffs' counsel are limited to Mr. Hedges.  Mr. Grubb offers nothing with respect to the reputation, skills, or training of Ms. Wagner and Ms. Bird.

The Court is also concerned that these affidavits do not provide evidence of "the prevailing market rates in the relevant community *for the type of work*" for which Plaintiff seeks an award.  *See Grissom*, 549 F.3d at 322 (quoting *Plyler v. Evatt*, 902 F.2d at 277) (emphasis added).   All of the peer affidavits contain identical, conclusory, and mechanistic catch-phrases that the requested hourly rates are reasonable and "within the range of hourly rates charged for attorneys of their experience and background in this community."  This would-be talismanic incantation, standing alone, is not the "satisfactory specific evidence" required by *Grissom*, *Plyler*, and other precedent.  Missing from these averments is evidence that local attorneys with similar academic experience, skills, training, and reputations as Plaintiff's counsel command and receive similar hourly rates as those requested here *and "for the type of work"* done here.  549 F.3d at 322.   It is unclear what these affiants actually mean when they state that the rates

requested are comparable to those charged by "attorneys of their experience and background in this community."   Doubtless, there are local attorneys with similar academic backgrounds, experience, and reputations as Plaintiff's counsel who charge the same hourly rates as those requested here.  But that is not the question.  The piece missing from Plaintiff's evidence is this: What is the going rate for local attorneys with comparable academic credentials and professional experience who represent clients in consumer law (or similar types of) cases?   It is not sufficient for the peer affiants to aver that rates requested by Plaintiff's counsel are commensurate with those charged by local attorneys with similar "experience and background."  It is unclear if this is a reference to academic qualifications, professional training, legal practice, or something else. Moreover, with the exception of Mr. Grubb's endorsement of Mr. Hedges' reputation, no affiant says anything about the professional reputations of Plaintiff's counsel.   Peer affidavits should set forth specific information about the hourly rates actually charged and received by comparable attorneys taking on the representation of victims of predatory lenders or other comparable types of cases.   Such evidence would more closely reflect the prevailing market rate.[2]   With the

---

[2]        The Court questions whether affidavits from counsel-of-record in a case and local area practitioners should ever be the sole means of ascertaining true local market rates.  Such affidavits have some utility, but they are, after all, prepared by individuals with an understandable interest in propping up local market rates.

Although not tendered by Plaintiff, the Court is aware of the *United States Consumer Law Attorney Fee Survey Report*.  *See* Ronald L. Burdge, *United States Consumer Law Attorney Fee Survey Report*, 2010-2011 (available at http://www.nclc.org/images/pdf/litigation/fee-survey-report-2010-2011.pdf).  Mr. Burdge's survey was previously tendered in a case decided in this Court, *Harmon v. Virtuoso Sourcing Group LLC*, No. 2:11-cv-00334, 2012 WL 4018504 (S.D. W. Va. Sept. 12, 2012).  This survey has also been relied upon by other, but not all, federal district courts.  *See, e.g., Anderson v. Specified Credit Ass'n, Inc.*, Civil No. 11–53–GPM, 2011 WL 2414867, at *4 (S.D. Ill. June 10, 2011) (considering the 2010–2011 Consumer Law Attorney Fee Survey in determining the reasonableness of hourly billing rates in Federal Debt Collection Practices Act [15 U.S.C. § 1692] case); *Moreland v. Dorsey Thornton and Assocs. L.L.C.*, No. 10–cv–867, 2011 WL 1980282, at *3 (E.D. Wis. May 20, 2011) (same). *But see Bilazzo v. Portfolio Recovery Associates, LLC*, Civil No. 11–4517, 2012 WL 2464223, at *6 (D.N.J. June 25, 2012); *Schommer v. Accelerated Receivable Solutions*, No. 8:11–cv–95, 2011 WL 3422775, at *2 (D. Neb. Aug. 4, 2011).

Mr. Burdge's report lists the average hourly rates of consumer law attorneys in twelve geographic regions. The report, however, is not perfect.  West Virginia, a state bordered by no ocean, is lumped into the "Atlantic

exception of Mr. Grubb's affidavit, the peer affidavits fail to offer satisfactory evidence in this regard.

Accordingly, the Court has considered all of the affidavits submitted, although only one of the peer affidavits—Mr. Grubb's—is given significant weight.  The peer affidavits would have been more influential to the Court's ultimate determination had the local attorneys provided statements as to their (or their firm's) actual hourly rates in consumer law or comparable cases. *See Wolfe v. Green*, 2010 WL 3809857 *5.  The Court considers this an important omission.

>    2.    *The Experience, Reputation, and Ability of the Attorneys*

Ms. Wagner's affidavit states that she graduated from college with great distinction in 2001.  She states she graduated from law school, again with distinction, but inexplicably she provides no date.  The affidavit states that Ms. Wagner was admitted to the West Virginia State Bar in 2007.  After graduation from law school, whenever that may have been, Ms. Wagner clerked for Circuit Judge M. Blane Michael of the United States Fourth Circuit Court of Appeals. Again, Ms. Wagner provided no dates of her clerkship term.  Presumably, Ms. Wagner graduated from law school in 2007.  Presumably, she clerked for Judge Michael for at least one year, likely from August 2007 to August 2008.  Similarly, we have no information about what kind of law Ms. Wagner practiced when her clerkship term ended or when she was hired as a Mountain State

---

 Region," along with states with decidedly different legal markets such as New Jersey, Delaware, and the District of Columbia.  Of the regions listed in Mr. Burdge's report, the Court considers the "South Region," which includes Kentucky, or even the "Ohio Region," which is comprised solely of the state of Ohio, to be more closely analogous to legal practice in southern West Virginia.  The average consumer law attorney hourly rates in the South Region and the Ohio Region are $220 and $162, respectively, for an attorney with one to three years of practice as a consumer lawyer, like Ms. Wagner; $175 and $217, respectively, for three to five years, like Ms. Bird; and $270 and $321, for attorneys with thirty or more years' experience, like Mr. Hedges.  Even using the Atlantic Region as the measure, however, Mr. Burdge's report pegs Ms. Wagner's and Ms. Bird's rates at $229 and $234, respectively, far below the requested $275 rate.  Although not a perfect resource, this report may offer some additional perspective where the local market evidence is sparse and cannot be derived from disinterested sources.

Justice lawyer. Ms. Wagner's first time entries for work in this case began in May 2010. Thus, it is plain that Ms. Wagner was a very inexperienced lawyer who had been practicing law less than two years at the time she began to work on this case.

In contrast, Ms. Bird is straightforward about her professional credentials. Her affidavit provides, among other matters, that she graduated from law school with distinction, was admitted to the West Virginia State Bar, and began working at Mountain State Justice, all in 2006.

Mr. Hedges' affidavit establishes that he is a veteran consumer law attorney with considerable training and expertise who has practiced law in West Virginia for nearly forty years. Curiously, even though he serves as Executive Director of Mountain State Justice, Mr. Hedges' affidavit is silent as to the education, skills, training, and reputations of his associate lawyers, Ms. Wagner and Ms. Bird.

### 3. Attorneys' Fees Awards in Similar Cases

Plaintiff tenders evidence of fees and costs awards in other cases. In her motion, Plaintiff attaches a 2009 Roane County, West Virginia state court order that, following a predatory lending trial, awarded attorneys' fees to three Mountain State Justice attorneys, only two of which are involved here: Dan Hedges and Sara Bird. (Docket 77-8.)  The Court, which undertook a *Johnson* lodestar analysis, awarded Mr. Hedges a $400 hourly rate and Ms. Bird a $175 per hour rate.

Attached to Plaintiff's Reply are two additional West Virginia state court orders (Docket 80-1, 80-2). One of these orders, a 2011 Kanawha County case, awards Dan Hedges and another Mountain State Justice lawyer half of the fees and costs they sought. Ms. Wagner and Ms. Bird were not counsel in that case. It is unclear what the exact nature of the litigation was, but it does not appear to have been related to consumer law (or some comparable type of case). Moreover,

there is no indication in the page-and-a half order that a lodestar analysis was undertaken or what Mr. Hedges' hourly rate was in that case.

The other state court order tendered by Plaintiff in her Reply is a 2011 Harrison County order. There, Ms. Bird represented the defendants. The defendants in that case filed a counterclaim contending that the plaintiff, a mortgage financing company, committed fifty-seven separate violations of the WVCCPA. The jury found the mortgage company committed thirteen of the fifty-seven alleged violations. Ms. Bird's client requested a fees and costs award of $48,852. The court engaged in a lodestar analysis under state law and determined that a "limited award of attorneys' fees" was appropriate and awarded $30,000 in fees and costs. The order does not state what, if any, hourly rate was used in the court's calculation.

Plaintiff also cites two recent federal cases to support Ms. Wagner's and Ms. Bird's requested $275 hourly rate. These cases, however, are not particularly helpful insofar as the opposing parties explicitly and affirmatively did not challenge the reasonableness of the attorneys' fees request—including the hourly rates billed. Thus, no analysis of the *Aetna/Johnson* factors was ever conducted by the Court. *See Deluca v. Ocwen Loan Servicing, LLC*, No. 5:10-cv-00421 (S.D. W. Va. March 2, 2011) (Berger, J.) and *Delebreau v. Bayview Loan Servicing*, No. 6:09-cv-00245 (S.D. W. Va. Jan. 19, 2010) (Stanley, M. J.).

As noted by Defendant, Plaintiff fails to alert the Court to the one case decided in this Court that does aid the Court's analysis regarding Ms. Wagner's fees, that is, *Stalnaker v. Fidelity and Deposit Co. of Maryland*, No. 2:10-cv-00964, 2011 WL 1113407 (S.D. W. Va. March 25, 2011). There, Ms. Wagner submitted an affidavit on February 18, 2011, seeking to be paid at an hourly rate of $275 for work that was done in 2010 and 2011. Prior to receipt of the defendant's response in opposition to the plaintiff's motion for fees and costs, then-Chief Judge

Joseph R. Goodwin issued a Memorandum Opinion awarding, among other things, costs calculated using the $275 hourly rate for Ms. Wagner.  The Court, however, subsequently withdrew its opinion after the defendant filed its response in opposition to the plaintiff's motion. The plaintiff, as here, then provided affidavits from area attorneys attesting to the reasonableness of a $275 hourly rate for Ms. Wagner.  Those affidavits generally stated that a fee of $275 for Ms. Wagner was reasonable and reflects the current market rate in this community for attorneys with comparable experience and academic backgrounds.  The plaintiff also tendered the 2009 Roane County court order discussed above that awarded fees to Mr. Hedges and other Mountain State Justice attorneys (but not Ms. Wagner).  Thereafter, Judge Goodwin, after considering the evidence and the *Johnson* factors, determined that an appropriate hourly rate for Ms. Wagner was $190. *See id.* at 4 (Docket 42).

    4.    *The Amount in Controversy and the Results Obtained*

    In June 2010, Plaintiff filed her Complaint alleging that Defendant engaged in predatory lending and unfair practices in the servicing of her $79,000 mortgage loan.  The Complaint stated six counts: Unconscionable contract, illegal debt collection, two breach of contract counts, estoppel, and negligence.  Plaintiff requested an unspecified amount of actual and punitive damages, civil penalties under the West Virginia Consumer Credit Protection Act [W. Va. Code § 46A-2-127], declaratory and injunctive relief, and reasonable attorneys' fees and costs. Defendant moved to dismiss the Complaint in its entirety, but the Court only dismissed the negligence count.  Over the course of the following year or so, the parties engaged in discovery. One week before trial, the parties settled.  Pursuant to their settlement agreement, Defendant agreed to give Plaintiff the deed to her home, finance the $65,000 loan balance on favorable

terms, request that credit bureaus remove all negative credit references from Plaintiff's credit history, and pay reasonable attorneys' fees and costs.

 Defendant contends that Plaintiff achieved less than complete success because the "primary thrust of the complaint was recovery of damages and the settlement included no payment of damages." (Docket 79 at 9.)   Defendant also notes that it benefited from the settlement because it was able to sell a bank-owned property and obtain a new, profitable loan. Plaintiff replies that, although the settlement did not include money damages, she was "significantly successful in pursuing her claims."  (Docket 80 at 6.)  Plaintiff argues that before the lawsuit she lost her house and equity in the foreclosure, and her credit rating was negatively impacted.  The settlement resulted in her being given the deed to her home, a loan on more favorable terms and with a $15,000 lower balance than her prior loan, waiver of accrued interest and fees, a lowered monthly payment from $550 to $310, repair to her credit rating, and her litigation fees and costs.

        5.       *The Court's Reasonable Hourly Rate Findings*

Based on the parties' evidence and argument, and the Court's familiarity with this litigation and the local legal market, the Court makes the following findings:

The Court **FINDS** that an appropriate hourly rate for Ms. Wagner, the lead counsel in this case, is $160.   In setting this rate the Court took into consideration that Ms. Wagner graduated with distinction from both college and law school, and secured a federal clerkship term.  She has some experience lecturing on consumer law issues and some appellate experience.  The Court also considered the fact that Ms. Wagner was a very inexperienced attorney at the time this case was filed, and, as in *Stalnaker*, most of her work was done in 2010 and 2011.  In selecting this rate the Court also considered the fact that Plaintiff tendered an affidavit by Ms. Wagner, lead

counsel in the case, that inexplicably fails to set forth fundamental, simple and essential facts: when she graduated from law school, the length of her clerkship term, and the type of legal practice prior to joining Mountain State Justice.  The Court also considered the peer affidavits tendered by Plaintiff.  As noted previously, with the exception of Mr. Grubb's affidavit, these affidavits are deficient in several respects, but perhaps most notably because of the affiants' failure to state what hourly rates the affiants (or their colleagues) actually charge and receive when representing clients *in cases of this type* (that is, consumer law or some other comparable type of case).  The Court also considered that a lower rate than requested was reasonable in light of Plaintiff's failure to include these peer affidavits with its motion and only offered this evidence after Defendant filed its response.  As noted with protest by Defendant, Plaintiff's counsel has made this error before and was previously penalized for it by this Court.  *See Watkins v. Wells Fargo*, No. 3:08-cv-0132, 2010 WL 2486247 *3 (S.D. W. Va. June 15, 2010) (Chambers, J.) (reducing Dan Hedges requested hourly rate from $425 to $350 and Sara Bird's rate from $250 to $175, in part, because of evidentiary failings of the plaintiff's motion that plaintiff later cured by submitting evidence with her reply).  Additionally, this rate is in line with the $175 rate permitted for Sara Bird in 2010, who, having graduated from law school in 2006, has one more year experience, presumably, than Ms. Wagner.  *See Watkins v. Wells Fargo Home Mortg.*, No. 3:08-cv-0132 (S.D. W. Va. June 15, 2010) (Chambers, J.).

The Court **FINDS** that an appropriate hourly rate for Ms. Bird is $175.  In arriving at this rate, the Court considered, among other matters, that Ms. Bird graduated from law school with distinction in 2006 and had approximately four years of legal experience at the time she performed work on this case.  The Court further considered Ms. Bird's legal experience, all of which was acquired with the specialized law office of Mountain State Justice.    The peer

affidavits were given little weight because, as with Ms. Wagner, none of the affiants expressly vouched for Ms. Bird's skills and reputation.   The Court also considered the $175 rates previously awarded to Ms. Bird in the 2010 *Watkins* decision and the 2009 Roane County case. The Court also considered *Finley v. Citimortgage, Inc.*, No. 1:10-cv-12, 2010 WL 3810831 (N.D. W. Va. Sept. 27, 2010) (Kaull, M.J.) (finding the hourly rate of $275 charged by Ms. Bird for her work on a motion to compel discovery excessive).

The Court **FINDS** that that an appropriate hourly rate for Mr. Hedges is $375.   Mr. Hedges' own affidavit and that of Mr. Grubb establishes that Mr. Hedges is a preeminent consumer law attorney who has devoted his lengthy career to this highly specialized area of public interest law.   Mr. Hedges' time sheet reflects that nearly all of his work in the case was done in 2010.   The Court also gave some weight to the fact that Mr. Hedges' was awarded an hourly rate of $400 in the 2009 Roane County award case.[3]   The Court is also mindful of this Court's statement that the "top end of the market rate" for local counsel in a recent class action suit was $500.   *Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756 (S.D. W. Va. March 6, 2009) (Goodwin, C.J.)[4]   The Court's determination of Mr. Hedges' rate in this case was further influenced by the fact that, in addition to being counsel in this case, he is also the Executive

---

[3]   Plaintiff directed the Court's attention to *Sams v. Cambridge Fin. Servs. LLC*, No. 5:08-ap--5023 (S.D. W. Va. Bkr. May 1, 2012).   There, Mr. Hedges was awarded an hourly rate of $425 in a predatory lending case, but the order does not explain its fees analysis.   The Court notes that the record in that case shows that the defendant opposed the $425 hourly rate.   The Court further notes that the record shows that the plaintiffs in that case offered only Mr. Hedges's affidavit and no peer affidavits or other evidence to support this fee rate.   For these reasons, the Court declines to rely on this precedent.

[4]   Although the type of legal work performed here differs significantly from that in *Jones*, the market rate referred to by Judge Goodwin in the *Jones* case was the rate for highly experienced and reputable class action practitioners in West Virginia litigating an oil and gas royalties dispute.

Director of Mountain State Justice.  His rate may have been higher but for the evidentiary and procedural failings of the motion at issue.

In making these findings the Court also considered the results counsel achieved.  As noted by Defendant Plaintiff sought actual and punitive damages, but settled the case without any payment of damages.  Nonetheless, Plaintiff obtained a favorable settlement that included restructuring her loan on favorable terms and repair to her credit rating.  The Court does not find that the foregoing hourly rate determinations should be altered based on the results achieved. *See Blum*, 465 U.S. at 898–900.

### B.   Reasonable Number of Hours Worked

Plaintiff bears the burden of proving that the number of hours her counsel worked is reasonable. "When plaintiff prevails on only some of the claims made, the number of hours may be adjusted downward; but where full relief is obtained, the plaintiff's attorney should receive 'a fully compensatory fee,' and in cases of exceptional success, even an enhancement." *Hensley v. Eckerhart,* 461 U.S. at 435.   "The number of hours must obviously be adjusted to delete duplicative or unrelated hours. At bottom, the number of hours must be reasonable and must represent the product of 'billing judgment.' "  *Id.* at 437.

### 1.   Reasonableness of Attorney Hours

Plaintiff's counsel claim the following number of hours: Ms. Wagner, 109.40 hours; Ms. Bird, 1.20 hours; and Mr. Hedges, 12.00.  Plaintiff's counsel state that they exercised billing judgment and that their hours are conservatively calculated.  Defendant argues that the Court should reduce the overall number of hours by thirty-five percent because Plaintiff's counsel's time entries are "too vague to allow the Court or Wells Fargo to review the reasonableness of the

task at hand."  (Docket 79 at 7.)    Defendant's specific objections take aim only at Ms. Wagner's time entries.  (*Id.*)

Defendant is correct that many of Ms. Wagner's time entries fail to describe with any specificity the tasks performed.  For example, Ms. Wagner's timesheets lists action she has taken (*e.g.* "legal research," "revise," "draft," "discovery," "email," and "preparation."  (Docket 77-2.)  Such descriptions are discouraged.  *See Wolfe v. Green*, 2010 WL 3809857 at *9 (citing *Rum Creek Coal*, 31 F.3d at 180).    As noted by Judge Copenhaver in *Wolfe*, simply adding a brief description of the documents reviewed or drafted will usually be all that is needed to remedy this deficiency.  The Court notes that many of Ms. Wagner's entries are satisfactory (*e.g.* "deposition of Adam White," "draft and legal research for resp. to MSJ," "research Freddie Mac guidelines," and "draft and prepare motion to reopen case and for attorney fees."  (*Id.*)  Ms. Wagner's time entries became somewhat more detailed as the case went on, presumably because she gained more experience as a lawyer.  The Court also notes that the amount of time Ms. Wagner allotted for the tasks listed in her timesheets is always a conservative number.

Defendant also contends that Plaintiff is not entitled to claim $770 fees for 2.80 hours of Ms. Wagner's time for preparing the motion for attorneys' fees and costs.[5]  Defendant reasons that the settlement agreement included an agreement for reasonable attorneys' fees incurred in the underlying litigation, not fees incurred in subsequent litigation concerning reasonable fees and costs. (Docket 79 at 9.)   The Court has reviewed email correspondence between counsel wherein Defendant's counsel, Jeffrey Patterson, explicitly states that his client accepts Plaintiff's terms of settlement.  (Docket 77-1.)  Those terms, as stated by Mr. Patterson, include "reasonable

---

[5]  Defendant has misread Ms. Wagner's timesheet.  There is at least one other entry relating to the motion for fees listing $192.50 for .70 hours of work.

attorney fees and costs to be negotiated separately or to be submitted to the Court." (*Id.*) The Court can discern no limitation by Mr. Patterson that fees and costs are limited to the underlying claims and not costs incurred in the event the matter was submitted to the Court.

In consideration of the foregoing, the Court **FINDS** that a ten-percent reduction of the total number of hours billed (109.40) by Ms. Wagner will remedy the impermissibly vague time entries. Accordingly, the Court **FINDS** that a reasonable number of attorney hours for Ms. Wagner is in this case is 98.46 hours, and the total number of reasonable attorney hours in this case is 111.66.

> ### 2.     *Reasonableness of Paralegal Hours*

Additionally, although Defendant did not challenge the Plaintiff's $100 paralegal rate, it does contend the fees billing for paralegal services should be reduced because the claimed hours include administrative and secretarial duties, not paralegal work. (*Id.* at 7-8.)

Two individuals performed paralegal work for Plaintiff on this case, Tonya Burdette[6] and Miranda Johnson. The time sheet for Ms. Burdette, Ms. Wagner's "legal assistant", contains forty-six entries each identically stated as "Organization pleadings index." (Docket 77-4.) The total time billed by Ms. Burdette is 9.20 hours at an hourly rate of $100 for a total of $920. (*Id.*)

Ms. Johnson's time entries include a variety of stated tasks. (Docket 77-6.) Her time on the case tallies to 7.0 hours at $100 an hour for a total of $700. Her time sheet bills for items such as "Calendaring, removing dates from dh's calendar to JW's calendar," "telephone call with opposing Attorney/calendaring," "Preparation of pleadings putting rogs on system," "letter to counsel," and "bates numbering docs." (*Id.*) Numerous entries for Ms. Johnson's time are stated

---

[6]   Plaintiff tendered an affidavit of "Tonya Burdette" (Docket 80-8) in support of a time sheet for an individual named "Tonya Fields" (Docket 77-4). Plaintiff fails to explain this discrepancy, but the Court will assume this is the same person.

as "Copies printing/saving ecf filings." (*Id.*) Defendant claims that the Court should deny Ms. Burdette's' $920 fees altogether because the forty-six entries do not constitute paralegal work, but rather non-billable administrative time.

Defendant also takes issue with the entries on Ms. Johnson's time sheets described as "calendaring" and "copying." (*Id.*) Citing *Hyatt v. Barnhart*, 315 F.3d 239, 255 (4th Cir. 2002), Defendant claims this work is "purely administrative" and non-compensable work for a paralegal. Plaintiff responds that the total number of paralegal hours billed (16.2) was reasonable in light of the length of the case (two years). Plaintiff adds that the paralegals' work in keeping the case files organized and keeping track of deadlines is "not simply firm overhead" as *Hyatt*. (Docket 80.)

In *Hyatt*, the Fourth Circuit stated that, although paralegal fees were recoverable in that case, "such fees are only recoverable to the extent they reflect tasks traditionally performed by an attorney and for which the attorney would customarily charge the client." 315 F.3d at 255. The court declined to "venture to decide at this time which specific paralegal tasks are not compensable under these principles in this case. . . ." *Id.* Prior to remanding the case to district court, the court did, however, note that the examples of paralegal work under scrutiny "do not seem to be of the type that would be traditionally performed by an attorney and charged to a client." *Id.* The "paralegal" work at issue in that case included "opening and sorting mail, making bulk mailings, traveling to post offices and other mail facilities, confirming hotel reservations, speaking with hotel staff, arranging for repairs of a computer, and planning a volunteer recognition breakfast for Hyatt volunteers." *Id.*

In a case involving an attorneys' fees dispute, the Supreme Court had occasion to offered examples of traditional paralegal work. *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 288 n.10 (1989). There, the Court noted

> paralegals are capable of carrying out many tasks, under the supervision of an attorney, that might otherwise be performed by a lawyer and billed at a higher rate. factual investigation, including locating and interviewing witnesses; assistance with depositions, interrogatories, and document production; compilation of statistical and financial data; checking legal citations; and drafting correspondence. Much such work lies in a gray area of tasks that might appropriately be performed either by an attorney or a paralegal . . . Of course, purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them.

*Id.*

Based on the Court's examples of paralegal work given by the Supreme Court in *Missouri v. Jenkins by Agyei* and the description in *Hyatt* of the tasks the fee applicant claimed was "paralegal" work, it appears that the time entries here for "organizing", "calendaring", and "copying", are not within the realm of billable paralegal tasks. That is not to say that such tasks are never within the scope of a paralegals' work. Much has changed in law offices since *Missouri v. Jenkins by Agyei,* or even *Hyatt*, was decided. The advent of computer technology has brought a brave new world to the practice of law. With the advent of computerized legal research, electronic case filing, e-discovery, digital case processing, a myriad of case management and development software programs such as CaseMap, Masterfile, Summation, and Concordance, tasks such as "organizing" and "copying" (but likely not "calendaring") conceivably could involve 21st-century tasks that lie in that "gray area" of paralegal and lawyer work, such as conceiving of and constructing a CaseMap project.

The Court need not answer that question today. Here, Plaintiff has offered no evidence to support a finding that Ms. Burdette's "organization" of a pleadings index or Ms. Johnson's

"calendaring" and "copying" are anything other than secretarial tasks.  Accordingly, the Court **FINDS** that none of Ms. Burdette's time entries are billable as presented.   Similarly, the Court also **FINDS** that Ms. Johnson's "calendaring" and "copies" time entries appear to be administrative or secretarial in character and, thus, are not billable.  The Court's analysis is frustrated by the fact that some of Ms. Johnson's entries contain references to multiple tasks, some plainly billable, some not.  This practice is discouraged.  *See Wolfe v. Green*, 2010 WL 3809857 at *8.  Because Plaintiff provides no evidence as to the percentage of time each task represents, the Court has no way of discerning how much time to disallow from the entry.  Thus, the Court will discount the entry in its entirety.  Accordingly, the Court **FINDS** that a reasonable number of hours for Ms. Johnson's paralegal work is 1.9 hours, which equals $190.

In sum, the Court's lodestar **FINDINGS** are:

| | | |
|---|---|---|
| Attorney Jennifer S. Wagner | 98.46 hours/$160 per hour | $15,753.60 |
| Attorney Daniel F. Hedges | 12.00 hours/$375 per hour | $ 4,500 |
| Attorney Sara Bird | 1.20 hours/$175 per hour | $    210 |
| Paralegal Tonya Fields | 9.20 hours/$100 per hour | $      0 |
| Paralegal Miranda Johnson | 1.9 hours/$100 per hour | $    190 |
| Total Lodestar Fees | | $ 20,653.60 |

Additionally, Plaintiff claims $3,349.60 in expenses.  Based on the exhibits Plaintiff tendered with her Reply (ECF 80-9), these expenses are supported and justified.  Accordingly, the Court **FINDS** that Plaintiff is entitled to an award of **$3,349.60** for expenses.

3.      *Adjustment to the Lodestar Amount Based on Remaining* Aetna/Johnson *Factors*

"[A] reasonable attorney's fee is one that is adequate to attract competent counsel, but that does not produce windfalls to attorneys." *Blum*, 465 U.S. at 897.  The lodestar fee is presumptively sufficient to induce a capable attorney in the prevailing market to represent a client in a meritorious consumer law or other comparable case. *See Perdue v. Kenny A*., *supra,* 130 S.Ct. at 1672.  The presumption that the lodestar fee is sufficient is strong.  *Id.* at 1673.  The burden of proving that an enhancement is necessary is borne by the fee applicant.  *Id.* Enhancements to the lodestar amount for performance may be awarded in rare and exceptional cases.  *Id.* (citing *Delaware Valley I,* 478 U.S. at 565–566); *see also, Blum*, 465 U.S. at 897; *Hensley*, 461 U.S. at 435.  The lodestar fee "includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee." 478 U.S. at 566.   A lodestar enhancement "may not be awarded based on a factor that is subsumed in the lodestar calculation." *Perdue*, 130 S.Ct. at 1673 (citing *Burlington v. Dague,* 505 U.S. 557, 562–63 (1992).

Plaintiff contends that an enhancement to the lodestar fee is appropriate for two reasons. First, Plaintiff claims this case presented novel and difficult issues.  The Court disagrees.  This case involved a non-complex predatory mortgage lending and servicing claims concerning a $79,000 home mortgage.   Moreover, the presence of novel and difficult issues, however, generally may not be used as a ground for an enhancement because these considerations "presumably [are] fully reflected in the number of billable hours recorded by counsel." *Id.* at 563 (citing *Blum* at 898).  Similarly, "the quality of an attorney's performance generally should not be used to adjust the lodestar '[b]ecause considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate.' " *Id.* (citing *Delaware Valley I*, at 566).

Plaintiff's second argument for a lodestar enhancement is more challenging.  Plaintiff argues that an enhancement is appropriate because "Mountain State Justice, Inc. is the sole legal services organization in West Virginia providing legal assistance at no cost to low-income recipients with complex credit issues and claims."  (Docket 77 at 5.)  Plaintiff contends that it is "simply not feasible for most private bar attorneys" to take on the types of cases that Mountain State Justice handles and that Mountain State Justice "fills a void in this much needed and specialized practice area."  (*Id.*)  In its response to Plaintiff's motion for fees and cost, Defendant did not dispute Plaintiff's representations and failed to address this argument.

In examining the affidavits Plaintiff submitted from local counsel, the Court noted earlier that three out of four of these peer affidavits were deficient because the affiants compared Plaintiff's counsel with local counsel of similar "background and experience", but were silent as to whether the prevailing rate was the local market rate for the type of work that was done in this case.  Based on Plaintiff's uncontested assertions that Mountain State Justice "fills a void" in the local representation of low-income persons aggrieved by business credit practices, it stands to reason that perhaps there is no true "prevailing market rate" for such services or that the "rate" is established by such a small number of willing practitioners that "prevailing market" for these services does not fairly exist.

This argument has some merit.  Although noting that the strong presumption that the lodestar figure reflects a reasonable fee, the Supreme Court stated in *Perdue* that a lodestar enhancement "may be appropriate where the method used in determining the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value . . . This may occur if the hourly rate is determined by a formula that takes into account only a single factor (such as years since admission to the bar) or perhaps only a few similar

factors." *Perdue*, 130 S.Ct. at 1674. In the example under consideration, the Supreme Court was exploring the propriety of an enhancement based upon exceptional performance by a very young attorney. Without the enhancement, a lodestar rate may be unreasonable because the lodestar calculation weighted the length of the attorney's brief experience in practicing law but not his extraordinary legal skill. (Under the *Aetna/Johnson* methodology, this result would not occur because the *Aetna/Johnson* factors generally take into consideration attorney skill).

Importantly, the West Virginia Supreme Court of Appeals, as noted *supra*, recently approved of the trial court's consideration of the fact that the plaintiff was represented by Mountain State Justice and that Mountain State Justice was a "unique organization" that "survives based upon fees collected in 'undesirable' cases such as [plaintiff's]." *Vanderbilt*, 2013 WL 870442, slip op. at *24. The West Virginia Supreme Court stated that this was a proper consideration under *Aetna*'s "undesirability" factor. *Id.*

In light of *Vanderbilt,* the particular facts of this case, and the absence of any opposition by Defendant, the Court in inclined to agree that the lodestar analysis in this case does not adequately measure the true market value of Plaintiff's uniquely situated counsel. Accordingly, the Court **FINDS** that a twenty percent enhancement to the lodestar figure of $20,653.60 is appropriate in this case and, thus, **AWARDS $24,784.32** in attorneys' fees and **$3,349.60** expenses to Plaintiff for a total award of **$28,133.92**. In making this determination, this Court was mindful of its duty to apply West Virginia law in its attorneys' fees reasonableness analysis to the extent that federal law conflicts with West Virginia law. In the face of the "strong presumption" under federal law that the lodestar figure represents a reasonable fee, an enhancement based on the fact that Mountain State Justice's lawyers served as counsel may not have been applied but for consideration of West Virginia precedent and Defendant's failure to

respond to this factor.  Importantly, the Court's decision to apply this enhancement in this case should not signal that it will apply an enhancement in every case where Mountain State Justice's lawyers serve as counsel.  Rather, the Court's decision to apply the enhancement was purely an exercise of its discretion under the particular facts of this case.

*IV. CONCLUSION*

The Court **GRANTS** the motion to re-open the case, **DIRECTS** the Clerk to re-open this case, and **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion for an attorneys' fees award.  The Court **ORDERS** Defendant Wells Fargo pay Plaintiff **$24,784.32** in attorneys' fees and **$3,349.60** in costs and expenses for a total award of **$28,133.92**.  The Court **DISMISSES** this case and **DIRECTS** the Clerk to remove this case from the Court's Docket.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:     March 29, 2013

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE